**United States District Court**
**Eastern District of Michigan**
**Southern Division**

| | |
|---|---|
| United States of America, | Criminal No. 19-CR-20472 |
| Plaintiff, | Honorable Gershwin A. Drain |
| v. | |
| D-1 Christian A. Newby, | |
| Defendant. | |

_____/

**Government's Sentencing Memorandum**

I.    **Introduction**

Christian Newby operated a sophisticated identity theft and fraud scheme to fund dangerous and illegal activities, including drug abuse, firearms purchases and the manufacture of explosive devices.  Newby's hundreds of victims varied from individuals whose identities were compromised, to corporations and financial institutions who suffered hundreds of thousands of dollars in losses.

Newby's guideline calculations result in a range of 41 to 63 months on Counts 1 and 3 (wire fraud, unlawful use of controlled substances in possession of firearms ammunition and explosives), plus a 24 month consecutive sentence for Count 2 (aggravated identity theft).  For the reasons that follow in this memorandum, the United States recommends that this Court sentence Newby to 75 to 87 months' incarceration.

1

## II.   Facts

### a.  Newby Steals Identities and Defrauds Amtrak

Newby, using websites on both the "Surface Web" and the "Dark Web,"

purchased hundreds of stolen means of identification of others.  When most people

think of the Internet, they think of what is known as the "Surface Web," which is the

World Wide Web (www.example.com).  The Dark Web is less than 5% of the World

Wide Web, and is made up of websites that are not indexed by search engines like

Google.  These websites are only accessible using special software.

Searches of Newby's multiple computers and electronic devices indicated he

used websites on the Dark Web, such as "Kriminal.se," to purchase the hundreds of

stolen identities anonymously.  Websites like "Kriminal.se" look like, and have similar

functionality as "Amazon" or "eBay."  However, these Dark Web marketplaces act as

a haven for illicit activity, to include stolen identities, and illicit drugs.



**Figure 1: Newby's Devices**

These stolen identities purchased by Newby were akin to a package, with enough identifying information about people and their finances to assume their identities and spend money.  Newby, in total, obtained at least 1100 credit cards, without authorization.   (R: 13, Plea Agreement, pp. 4).

With the credit cards, Newby assumed the identities on each credit card to purchase tickets from Amtrak – importantly, he never intended to take any of the trips he purchased.  (*Id.* at 5) Rather, after Newby purchased the Amtrak tickets, he would cancel the trip, and receive vouchers redeemable in the cash amount of the trips.  (*Id.*)

Next, Newby would sell the vouchers on websites like "eBay" to innocent purchasers.  Newby used the names of third parties, without their authorization, to create the "eBay" accounts he used to sell the Amtrak vouchers. (*Id.*)

Finally, Newby would accept money via websites like "PayPal" for the vouchers, sold with stolen identities, advertised under fraudulent names, and transferred to innocent purchasers.  The victims were many: individuals whose identities were compromised, Amtrak, credit card companies, and financial institutions.  His victims include, but are not limited to, Amtrak, Bank of America, Navy Federal Credit Union, Wood Forest National Bank, Capital One Bank, First National Bank of Omaha, TD Bank, Bancorp Bank, Citibank, Discover Card and

Comerica Bank.  (PSR ¶ 20).  In total, Newby used sophisticated means to create at least $580,226.00 Dollars in loss to multiple victims.

This chart illustrates the steps of the fraud scheme:



**Step 1:**
- **Newby accesses the Surface Web and Dark Web anonymously**
- Once online, **Newby obtains stolen identities**

**Step 2:**
- **Newby assumes the stolen identities**
- Newby uses their credit cards to purchase things of value

**Step 3:**
- Newby asks for those purchases to be refunded
- They are refunded as vouchers
- He did this twice for each voucher, this step **"cleans the money"**

**Step 4:**
- Newby sells the vouchers to innocent purchasers

**Step 5:**
- **Individuals** whose identities are compromised notify their credit card companies and banks to **report the fraud**
- **Companies** like Amtrak, and credit card companies, are left to **assume the loss** as the voucher has already been issued

**Figure 2: The Scheme**

Newby repeated these steps hundreds of times, with hundreds of identities compromised, and hundreds of thousands of dollars in loss to various victims. All the while, himself living under an alias, "Kyle Hopper," to mask his identity from law enforcement.

### b. Agents Recover Explosives, Guns, Drugs and Money

On January 31, 2019, agents executed a search warrant on Newby's house. The probable cause for the search was based entirely on the fraud scheme. Upon its execution, agents encountered a considerably different environment.



**Figure 3: Explosive Devices**



**Figure 4: Firearm recovered from residence**



**Figure 5: Firearm recovered from residence**



**Figure 6: Currency, Narcotics, Scales**

In total, 19 separate IEDs' were recovered. (Figure 3, PSR ¶ 17). Agents

recovered multiple firearms, including an Inter Ordinance, Inc., Model Sporter,

7.62x39 caliber, AK-47 type rifle with an underfolder stock, in the main bedroom

hanging over the closet on two hooks, loaded with a 75-round drum magazine

containing 70 rounds of ammunition and one round in the chamber. (Figure 4, PSR ¶

16). Also in the residence was a Kel-Tec, Model RDB, .223 caliber semi-automatic

bullpup rifle loaded with 60 rounds in a drum magazine and one round loaded in the

chamber. (Figure 5, PSR ¶ 16). Finally, agents recovered narcotics, narcotics-related

paraphernalia, and currency. (Figure 6, PSR ¶ 16).

## III.   Advisory Sentencing Guidelines

Although the sentencing guidelines are advisory, the Court must nonetheless

begin its sentencing analysis by properly calculating the applicable range defendant

faces. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The advisory Guidelines

7

remain an important factor in sentencing. "[I]t is fair to assume that the Guidelines . . . reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 345 (2007).

Newby and the Government entered into a plea agreement pursuant to Fed. R. 11.  In it, the parties agreed that based upon a total offense level of 24 and a criminal history category of I, the guideline imprisonment range was 51 to 63 months, plus 24 months consecutive because of the aggravated identity theft.  (R: 13, Plea Agreement, pp. 8).  Moreover, the plea agreement was submitted pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C), with the parties agreeing that the sentence may not exceed 87 months, which is the top of the sentencing guideline range.  (*Id.* pp. 9).

## IV.    Sentencing Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary."

Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have

been found guilty of similar conduct; and (7) the need for restitution. The most

relevant factors are evaluated below.

1. **Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)**

The nature and circumstances of the offenses Newby was convicted of support

a guideline sentence. As an initial matter, Newby used incredibly sophisticated means

throughout the duration of the fraud scheme. This made the offense harder to detect.

Moreover, it made it difficult, if not impossible, to determine all of the individuals and

corporations who would constitute victims.

As an example, consider a victim who had their identity compromised by

Newby. In a best-case scenario, they might immediately report a fraudulent charge

from "Amtrak" to their credit card company and have the charge voided. Even there,

that victim had to spend time and effort acquiring new card numbers, potentially

purchasing insurance against fraud, and fixing issues related to their credit. But even

in this example, when the fraud scheme stops, Newby has money and someone else

doesn't. In most instances, Amtrak.

Then consider that Amtrak, while private, was established by Congress,

pursuant to the Rail Passenger Service Act of 1970. Amtrak receives significant

funding from federal authorities, including the U.S. Department of Transportation.

The Freedom in Information Act applies to Amtrak, and it was designated as a

"federal entity" under the Inspector General Act of 1978. In sum, this means that

Newby's unjust and illicit enrichment came at the expense of the People of the United States of America.

### 2. Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The seriousness of manufacturing explosive devices cannot be overstated – particularly here, where Newby was quite literally building his own bombs.  Even if the Court assumes that Newby was taking reasonable precautions to protect himself, the very existence of these explosive devices in a residential community should give this Court pause.  The execution of the search warrants in this case provides an illustration of how this type of activity endangers everyone around it.  Agents had no way of knowing when they went to execute search warrants to recover computers in a fraud investigation that they would have stumbled into a property packed with weapons and explosives.

### 3. Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C)

This factor includes two components—specific deterrence and general deterrence. Specific deterrence looks to dissuade an individual defendant from committing future crimes, while general deterrence aims to have the same effect on "the population at large." *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010).

The fraud scheme is successful because of its sophisticated nature, and the steps taken by Newby to remain anonymous.  These factors make it that much more difficult to (1) identify the individuals responsible and (2) effectively police.  That is

why a guideline sentence affords general deterrence.  This supports the notion that similarly situated people, regardless of jurisdiction or location of offense, are treated the same.  This is particularly relevant here, where the crime Newby committed could be committed by anyone, anywhere, with access to the internet.

General deterrence is equally as important as it relates to the possession of firearms and explosive devices, and their mixture with drugs like methamphetamine.  While the evidence indicates Newby to be a user, as opposed to a large-scale drug distributor, the fact is that Newby was using methamphetamine while possessing firearms and manufacturing explosive devices.  Both Newby, and his community, were incredibly fortunate that no accidents happened.

Specific deterrence is also supported by the sentence recommended by the government.  In addition to the custodial sentence imposed in this case, this Court should impose supervised release terms consistent with an individual who has demonstrated the substance abuse history of Newby.  This, in addition to a term of incarceration, will provide significant deterrence from Newby engaging in similar crimes in the future.

**V.**     **Conclusion**

The government recommends that the Court impose a sentence between 75-87

months incarceration.

<div style="margin-left: 50%;">

Matthew Schneider
United States Attorney

*s/ Robert Jerome White*
ROBERT JEROME WHITE
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9620
Robert.White@usdoj.gov

</div>

Dated:   April 9, 2020

## Certificate of Service

I hereby certify that on April 9, 2020, I electronically filed the foregoing

document under seal with the Clerk of the Court and will provide a copy of such

filing to the attorney of record, Penny Beardslee.

<div align="right">

*s/   Robert Jerome White*
ROBERT JEROME WHITE
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9620
Robert.White@usdoj.gov

</div>

13