UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

    Plaintiff,      Cr. No. 19-20472

v.              Honorable Gershwin A. Drain

CHRISTIAN NEWBY,

    Defendant.
_____/

**SENTENCING MEMORANDUM AND REQUEST FOR A DOWNWARD VARIANCE ON BEHALF OF CHRISTIAN NEWBY**
**I.**
**Introduction**

  Christian Newby a first time offender, by all accounts is a kind and generous person who like many individuals in this country, struggle with a drug addiction. He has been detained for the past 17 months–of which the last 6 have been spent in harsh conditions as a result of the COVID-19 pandemic. In light of these extraordinary times, coupled with Christian's first offender status, need for drug treatment and his super acceptance of responsibility, a sentence of 36 months and 1 day is "sufficient, but not greater than necessary" to achieve the purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

## II.  Consideration of § 3553(a) Factors

Section 3553(a) directs courts to impose a sentence that is "sufficient, *but not greater than necessary,* to comply with the purposes set forth in paragraph two." Those purposes include: (1) reflecting the seriousness of the offense; (2) promoting respect for the law and providing just punishment; (3) protecting the public; (4) deterrence; and (5) providing the defendant with educational or vocational training, medical care or other correctional treatment in the most effective manner.  Under § 3553(a), courts are further directed to consider other factors: (1) nature and circumstances of the offense and history and characteristics of the defendant; (2) need for the sentence imposed; (3) kinds of sentences available; (4) the sentencing guidelines range and any pertinent policy statement; (5) the need to avoid unwarranted sentence disparities among defendants with similar records and criminal conduct; and (6) the need to provide restitution to victims.  18 U.S.C. §3553(a)(1)-(7).  When a guideline "does] not exemplify the Commission's exercise of its characteristic institutional role," because the Commission "did not take account of 'empirical data and national experience,'" the sentencing court is free to conclude that the guideline "yields a sentence 'greater than necessary' to achieve § 3553(a)'s purposes, even in a mine-run case." *Kimbrough v. United States*, 552 U.S. 85, 96, 109-10 (2007).

### A.  The History and Characteristics of Mr. Newby

Overall, Christian's history and characteristics exemplify the principle that every criminal defendant is a "unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and punishment to ensue." *Koon v. United States*, 518 U.S. 81, 113 (1996). The circumstances surrounding Christian's life are of the nature that mitigates his offense. Christian was the only child born to the union of Michael and Karen Newby. At six months old, he was emotionally, physically and legally abandoned by his father. See Exhibit A -Letters of Support Distraught by the end of her marriage, Christian and his mother moved in with his grandmother and grandfather. They converted their garage into an apartment so that he and his mother could live with them. *Id.* At the age of 12, Christian and his mother moved out of his grandparent's home to a residence nearby. However Christian could not deal with the living conditions that arose as a result of his mother's hoarding disorder. He ultimately moved back with his grandparents.

There was a sense that Christian would have a tougher time growing up with a single parent. Consequently, the family rallied and supported Christian as much as possible. His Uncle and Aunt describe taking Christian on summer and family vacations. Exhibit A. While Christian's mother was involved in his life, she struggled with mental and physical health issues. Christian was primarily raised by his grandmother and grandfather–both of whom cared for him very much. He

reported attending church weekly with them and that they did their best to teach him right from wrong. In 2017, Christian's grandfather passed away due to heart failure. The death of his grandfather was extremely hard for Christian as he was his primary father figure throughout his life. PSR at ¶55

In addition to his family's support, Christian had and continues to have the support of Lorell and Breanne Thompson. Lorell and Christian were in a long term relationship for more than 12 years. Lorell described Christian as generous and supportive. She also described the role he played in bringing her family closer together. *Id.* Breanne Thompson, who describes herself like a sister Christian has equally generous words about Christian's kindness, generosity and support. *Id*. As the letters of support reveal, Christian has loving and supportive family and friends that want to help him succeed. With the proper treatment, Christian can reenter the community and once again be a law-abiding and productive member of society.

B. **Nature and Circumstances of the Offense-How Mr. Newby's Drug Addiction Led Him to the Offenses.**

The Center for Disease Control defines Adverse childhood experiences, or ACEs, as "potentially traumatic events that occur in childhood (0-17 years)".[1] ACEs

---

[1] https://www.cdc.gov/violenceprevention/aces/fastfact.html?CDC_AA_refVal=https%3A%2F%2Fwww.cdc.gov%2Fviolenceprevention%2Facestudy%2Ffastfact.html

are linked to chronic health problems, mental illness, and substance misuse in adulthood. *Id.* ACEs have been linked to a variety of changes in brain structure and function and stress-responsive neurobiological systems. The cumulative exposure of the ACEs on the developing brain of a child results in impairment in multiple brain structures and functions in the brain.[2] This is why teens develop depression and anxiety, and turn to unhealthy coping mechanisms like substance abuse and other self-destructive behaviors.[3] To understand Christian's offense conduct, it is essential to consider the adverse childhood experiences he endured in as much as he was abandoned by his father and lived with a parent who struggled with mental health issues.

Unfortunately, Christian began using drugs and alcohol in his teen years. Christian had periods of sobriety in his life, however after suffering a foot injury, he began using prescription opiate-based pain killers. He increased usage and became addicted like many Americans. Christian was able to complete college courses and maintain full-time employment until his late 20's. He would eventually begin to use methamphetamine and started to make his own capsules which he ordered from the dark web. The same websites on the dark web that offered the sale of drugs, offered

---

[2] *Id.*

[3] Van der Kolk, B.A., Fisler, R.E. Childhood abuse and neglect and loss of self-regulation. *Bulletin of the Menninger Clinic*; *Spring 94*, Vol. 58 Issue 2.

weapons and fraudulent information. His use of drugs blurred his reality and impacted his ability to maintain employment. See Exhibit B- Letter from Christian Newby. Consequently, he began participating in credit card fraud as a way to replace his income and support his drug addiction.

 Christian is remorseful for his conduct. He realizes the serious nature of the offenses and accepts full responsibility. As set forth in the Rule 11 Plea Agreement, Christian obtained personal identifying information (PII) without the owners consent and used the unauthorized information to purchase Amtrak tickets. After the tickets were purchased, Christian cancelled the Amtrak tickets and obtained vouchers for the value of the cancelled ticket. The vouchers were sold on Ebay at a reduced price. The scheme took place from approximately March 29, 2018 to January 31, 2019 and resulted in over $550,000.00 in loss.

 In February of 2019, law enforcement executed a search warrant in connection with the fraud investigation. In the course of the search, agents seized firearms, ammunition, destructive devices and small amounts of methamphetamine and amphetamine. At the time of the seizure, Christian was addicted to methamphetamine, and thus prohibited from possessing the seized items. Importantly, despite his drug addiction, he never sold drugs to others. The quantity seized was for his personal use. Additionally, Christian did not possess the firearms, ammunition and destructive

6

devices for any nefarious purpose. At no time did he ever intend to intimidate, scare or threaten anyone. Nor was he ever associated with any hate or terrorist groups. This was determined after the government conducted a thorough and comprehensive investigation of Christian. As conveyed by family and friends by the attached letters of support, Christian was always a kind, generous person who never exhibited any signs of violence.

Notably, throughout the course of the prosecution, Christian was extraordinarily cooperative with law enforcement and the Court should grant a variance for his extraordinary acceptance of responsibility. Significantly, after agents searched Christian's residence, the agents failed to recover all of the cash connected to the fraud. Christian informed the government that they had not recovered all of the cash and voluntarily turned it over. Rarely is it the case, that an individual voluntarily forfeits ill gotten proceeds. Christian's decision to act in this manner is extraordinary and although rare, sentencing courts have imposed downward variances when the defendant has accepted responsibility to an extraordinary degree beyond the normal case. *See United States v. Gardellini*, 545 F.3d 1089, 1095 (D.C. Cir. 2008) (affirming district court's downward departure because defendant "had cooperated with authorities and accepted responsibility for his crimes to an extraordinary degree.");*United States v. Milne*, 384 F.Supp.2d 1309 (E.D.Wis. 2005) (variance

7

imposed in a bank fraud case because adjustment for acceptance did not fully account for defendant's voluntary reporting of his misconduct to bank); *United States v. Brown*, 985 F.2d 478, 482 (9th Cir. 1993) ("[t]he mere existence of section 3E1.1(a) does not preclude the sentencing court from making an additional departure in the case where the defendant manifests an extraordinary acceptance of responsibility."). Christian's conduct demonstrates extraordinary acceptance of responsibility and warrants a variance below his guideline range.

### C. The Kinds of Punishment Available to The Court Will Satisfy the Goals of Deterrence, Punishment, and Protection of the Public

A sentence of 36 months and 1 day will sufficiently punish Christian while meeting the goals of deterrence, protection and punishment. The guideline range for Counts 1 and 3 is 51 to 63 months. Counsel seeks a downward variance to a year and 1 day given the extraordinary circumstances, Christian's status as a first time offender and his need for treatment. Defense counsel believes a sentence of 36 months and 1 day serves the goals of deterrence, punishment and protection while allowing an opportunity to provide treatment and rehabilitation for Christian so that he can become a productive member of society. In *United States v. Collington*, 461 F.3d 805, 808 (6th Cir. 2006), the Sixth Circuit held that a district court may consider the brevity of the defendant's prior incarcerations in determining whether a downward variance is

appropriate. In *Collington*, the defendant was a career offender with a guideline range of 188 to 235 months. The district court varied downward to 120 months-approximately 68 months. Despite the defendant's criminal history category of IV, the defendant had "never been in custody for any substantial period of time," having only been imprisoned for seven moths before this crime. *Id*. Counsel respectfully requests the Court to lack of any prison time that Christian has served in considering the appropriate sentence.

### D. The COVID-19 Pandemic Presents Extraordinary Circumstances In Which Christian Will Serve His Sentence And The Court Should Vary Downward.

Christian suffers from hypertension and has a BMI over 30 both of which place him at a risk of serious medical injury and or death if he becomes infected with COVID-19. This Court is well aware of the pandemic and the toll it has taken on individuals incarcerated in the BOP. As of the filing of this pleading, 121 inmates have died in the custody of BOP.[4] The pandemic has affected sentencing decisions inasmuch as it has altered the landscape for sentencing in every conceivable way. As this Court is well- aware, 18 U.S.C. § 3553(a) "contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary,' to accomplish the goals of sentencing." *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (quoting 18 U.S.C. § 3553(a)). With COVID, it is necessary to

---

[4] https://www.bop.gov/coronavirus/(accessed Sept. 21, 2020)

examine this statutory provision in a more deliberate way. Christian has one of the underlying conditions that make him vulnerable and one that might impact his vulnerability to COVID-19, in addition to the fact the he will have no access to programming, and rehabilitative resources he faces enormous risk to his health. A sentence within the guideline range is not necessary to meet the goals of sentencing.

18 U.S.C. § 3553(a)(2)(A) provides that the Court must assess "the need for the sentence imposed- . . . to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." As such, as part of its sentencing obligations, this Court must consider the need for the sentence imposed to "provide just punishment for the offense." COVID is one factor the Court should consider. On February of 2019, Christian was detained and has spent the last 18 months in custody. The last six months of custody have been spent in harsh conditions wherein he has been subjected to the constant fear of contracting a deadly disease, unable to assist his family in ensuring they are safe, and unable to visit family members or even his attorney. He will continue to face these struggles regardless of any sentenced imposed while the pandemic lasts.

Since March 13, 2020, BOP modified its operations to respond to the spread of COVID-19 and individuals in every institution " are "secured in their assigned cells/quarters to decrease the spread of the virus. Family and friends are prohibited

from visiting.[5] Programming, absent select UNICOR operations, has ceased and movement throughout the facilities is suspended. And while BOP's website claims movement exceptions are made to permit showers three times a week, telephone and email access, commissary, and laundry, in reality even these most basic activities are not allowed, and instead, conditions amount to a total lockdown for almost twenty-four hours a day. See Fed. Bureau of Prisons, Fed. Bureau of Prisons COVID-19 Action Plan (Mar. 13, 2020), https://www.bop.gov/resources/news/20200313_covid-19.jsp (Phase II). Phase II's modified operations were extended as described in Phase III, Phase IV, Phase V, Phase VI, and Phase VII. Institution lockdown commenced on April 1, 2020 (Phase V) and was subsequently extended through May 18, 2020, (Phase VI) and again through June 30, 2020 (Phase VII). And, at some facilities, once someone tests positive for the virus, they are put in solitary confinement. See, e.g., Class Action Complaint, *Torres v. Milusnic*, No. 20-cv-04450 (C.D. Cal. May 16, 2020), ECF No. 1, at 55 (Declaration of Joanna Perales) (petitioner placed in Special Housing Unit (SHU) after testing positive for COVID-19); Class Action Petition for Writ of Habeas Corpus, *Hallinan v. Scarantino*, No. 20-hc- 2088-FL (E.D.N.C. May 26, 2020), ECF

---

[5]Counsel notes that the BOP has announced that it will reside social visitation not later than October 3, 2020. https://www.bop.gov/resources/news/20200902_visitation.jsp.

No. 1-4, at 6 (Declaration of Roger Duane Goodwin) (Petitioner in FCI Butner Medium I moved to the SHU after testing positive for COVID-19). See also Fed. Bureau of Prisons, BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 28, 2020).

Christian has already experienced punitive harsh conditions at Milan FDC where he has been detained. He will not only will be on lockdown, and unable to engage in rehabilitative or productive programming, but he will also continue to be at grave risk of contracting COVID-19. CDC guidance because social distancing is simply impossible to achieve in the federal prisons -particularly during a lockdown. Unsurprisingly, these conditions have fueled the spread of COVID-19 throughout BOP facilities-numerous deaths have occurred and most of those tested within the BOP have the virus. Thus, because of COVID-19, any time Christian spends in custody will necessarily be more severe than it ordinarily would. See e.g., https://www.forbes.com/sites/walterpavlo/2020/07/16/bureau-of-prisons-using-solitary-confinement-as-a-means-to-curb-covid-19-contagion/#685159f193ad. See also Fed.Bureau of Prisons, BOP Implementing Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited May 28, 2020) (allowing three showers a week). This Court should account for the oppressive nature of BOP confinement by sentencing Christian to 36 months and 1 day.

Under 18 U.S.C. § 3553(a)(2)(D) this Court must also consider "the need for the sentence imposed-. . . to provide the defendant with needed. . . medical care. . . in the most effective manner." Surely in the middle of a pandemic that is taxing the medical resources of the BOP and communities in which the BOP facilities are located, this is not served by a lengthy incarceration.

Even under the best of circumstances, the BOP has struggled to provide medical care. In 2016, for example, DOJ's Office of Inspector General (OIG) found that BOP experienced chronic medical staffing shortages and failed to take adequate measures to address them, endangering the safety and security of its institutions. See, e.g., U.S. Dep't of Justice Office of the Inspector Gen., Review of the Federal Bureau of Prisons' Medical Staffing Challenges i-ii, 1-2 (Mar. 2016), https://oig.justice.gov/reports/2016/e1602.pdf. From 2010 to 2014, BOP's total medical staff was "approximately 17 percent less than what the BOP projected was necessary to provide what it considers to be 'ideal' care," and 12 institutions were so medically understaffed that they were described as "crisis level." *Id*. Lack of adequate staffing has resulted in medical personnel and other non-correctional staff working as guards, and has made wait times for individuals to receive even routine medical care unacceptably long. Unfortunately, as COVID-19 ravages its facilities, BOP's ability to provide effective medical care has only gotten worse. See Keegan Hamilton, Sick

Staff, Inmate Transfers, and No Tests How the U.S. is Failing Federal Inmates as Coronavirus Hits, Vice (Mar. 24, 2020), https://bit.ly/3eq7Rl7; see also Oversight of the Federal Bureau of Prisons and Implementation of the First Step Act of 2018: Hearing before the Subcomm. On Crime, Terrorism, and Homeland Security of the H. Comm. on the Judiciary, 115th Cong. 3-4 (2019) (statement of Kathleen Hawk Sawyer), https://bit.ly/2ZJlDeG.  Because BOP has failed to implement large-scale testing, it cannot effectively identify and isolate people with the virus from those who are healthy.

Additionally, 18 U.S.C. § 3553(a)(2)(D requires that the Court consider "the need for the sentence imposed. . . to provide defendant with needed educational and vocational training." One of the fundamental purposes of sentencing is rehabilitation. But rehabilitation is currently impossible in the BOP. In an attempt to respond to COVID-19, BOP has implemented a modified operation plan, which limits social visits, inmate movement, and has suspended all volunteer visits, including visits from religious advisors.  Under these modified operations, Christian will be unable to receive programming and rehabilitative resources, and instead, will be confined in his cell, much as he has been for the past 6 months.

### III.  CONCLUSION

Given the circumstances in this case, Christian respectfully requests that the

Court fashion a sentence that considers his first time offense, his substance abuse and his extraordinary acceptance of responsibility and impose a sentence of 36 months and 1 day.

                Respectfully Submitted,
                **FEDERAL COMMUNITY DEFENDER OFFICE**
                /s/ Natasha Webster
                Counsel for Christian Newby
                613 Abbott Street, 5th Floor
                Detroit, Michigan  48226
                313-967-5847
                Natasha_Webster@fd.org

Date:  September 22, 2020

**CERTIFICATE OF SERVICE**

I Natasha Webster, of the Federal Community Defender Office certify that on September 22, 2020 the foregoing document was served through the ECF system and USPO William Hampstead @William_Hampstead@miep.uscourts.gov.